## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **MYCHAL L. BOYD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 1:08-CV-960-VEH** |
| | ) |
| **HONDA MANUFACTURING OF** | ) |
| **ALABAMA, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINON

### I.    Introduction

Plaintiff Mychal Boyd ("Boyd") initiated this job discrimination and retaliation case on June 2, 2008, against Defendant Honda Manufacturing of Alabama, LLC ("HMA").  (Doc. 1).

Boyd's complaint contains three counts.  Count One is a race discrimination (failure-to-promote) and retaliation claim asserted pursuant to Title VII and 42 U.S.C. § 1981.  Count Two is a Title VII sex discrimination claim.  Count Three is an age discrimination claim under the Alabama Age Discrimination in Employment Act ("AADEA").  Boyd has since conceded that HMA never discriminated against him based upon his age and that he is not asserting an age discrimination claim in this

lawsuit.  AF 52.[1]

Pending before the court is HMA's Motion for Summary Judgment (Doc. 32) filed on August 16, 2010.  For the reasons explained below, HMA's Motion for Summary Judgment is due to be granted.

## II.   STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[2]  A dispute is genuine "if the evidence is such that a reasonable jury could

---

[1]  The designation "AF" stands for admitted fact and indicates a fact offered by HMA that Boyd has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case.  Whenever Boyd has adequately disputed a fact offered by HMA, the court has accepted Boyd's version. The court's numbering of admitted facts (e.g., AF No. 1) corresponds to the numbering of HMA's Statement of Facts as set forth in Doc. 33 and responded to by Boyd in Doc. 35.  Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Boyd's Statement of Facts contained in Doc. 35 and responded to by HMA in Doc. 36.

[2]  Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to FED. R. CIV. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1184-85 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the

3

defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## III.   STATEMENT OF FACTS[3]

### A.   HMA

HMA employs approximately 4,000 individuals at its Lincoln, Alabama plant. AF 1.  HMA employs Process Associates who work on the assembly line engaged in the daily tasks of assembling Honda Odyssey, Pilot, Accord, and Ridgeline vehicles; Process Associates may also be assigned to offline positions that do not require the associate to physically assemble or repair vehicles.  AF 2.

Process Associates may also be assigned to specific functions within a department; these functions are considered lateral assignments, not promotions, and do not result in any wage increase.  AF 3.  The Quality Auditor function is one such

---

[3] Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party. *See Fitzpatrick*, 2 F.3d at 1115.  Therefore, these are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'") (citation omitted).

lateral assignment as is the New Model assignment.  AF 4-5.  Quality Auditors are responsible for auditing departmental processes and ensuring processes comply with operational standards.  AF 4.  New Model is a temporary assignment in which associates work on new model development and testing until the new model is ready to be launched.  AF 5.

HMA employs Team Coordinators ("TC"), non-exempt "lead" associates, who assist management in scheduling manpower and ensuring Process Associates follow HMA's operational standards.  AF 6.  HMA also employs Associate Technical Specialists ("ATS"), exempt associates, who are responsible for reducing and preventing quality defects.  AF 7.

## B.   HMA's Equal Employment Opportunity and Mutual Respect Policies

At all relevant times, HMA has had in effect Equal Employment Opportunity and Mutual Respect Policies, which strictly prohibit any form of discrimination in all terms and conditions of employment, including, but not limited to, discrimination based upon race, sex, and age.  AF 8.  HMA's Equal Employment Opportunity and Mutual Respect Policies also prohibit any form of retaliation against an associate who reports a concern about discrimination.  AF 9.

HMA's Equal Employment Opportunity and Mutual Respect Policies are found

in HMA's Associate Handbook, distributed to associates upon hire and explained during orientation.  AF 9.  HMA's Equal Employment Opportunity and Mutual Respect Policies require an associate who believes he or she has witnessed or been subject to discrimination or harassment to immediately report it to his or her Team Manager, Department Manager, an Associate Relations ("AR") representative, or the Department Manager of Human Resources.  AF 11.

C.    **HMA's Promotion Process**

An associate interested in applying for an available promotion must submit a Job Interest Form and any other required documentation to AR by the job posting's deadline.  AF 12.  Applicants without active corrective action (meaning one issued within twelve months prior to the selection decision) or an excessive amount of attendance points are then eligible to be evaluated by their Team Manager.  AF 13, 19.  Since the spring of 2006, candidates also complete a self-assessment.  AF 13. Only those candidates scoring at least a 2.0 on the Team Manager assessment proceed to the interview phase of the selection procedure; however, if the number of eligible candidates is less than ten, all eligible candidates will be interviewed.  AF 14.

During the interview phase, the interview team asks the same questions to each candidate, using HMA's standardized interview guide.  AF 15.  Immediately following the interview, the interview team assigns each candidate an interview score

by comparing notes and agreeing on the score each candidate should receive for each area of questioning.  AF 16.  Each candidate's interview score is averaged with his or her respective assessment score, and the candidate with the highest [combined] score typically receives the available position.  AF 17.

HMA also has an Internal Mobility Program that is designed to allow both non-exempt and exempt associates to express interest in openings throughout HMA.  AF 18.  In order to participate in the Internal Mobility Program, an associate must meet certain minimum criteria, including, but not limited to: submitting a resume, having a minimum performance rating of "meets expectations," having a minimum of twelve months' service with HMA, having no more than three attendance points, not having an active corrective action, and being able to perform the open job's essential functions.  AF 19.  Eligible associates are then interviewed, and the candidate with the highest interview score generally receives the available position.  AF 20.

### D.   Boyd's Employment with HMA

Boyd applied for employment with HMA on June 5, 2001, and began working as a Process Associate on July 30, 2001.  AF 21.  Boyd receive the Associate Handbook upon his hire.  AF 21.  Boyd initially worked in an online position in the Weld Department, A Zone, but was later selected for an offline Line Quality Process Associate position.  AF 22.

7

On January 11, 2008, Boyd received a Level II Written Counseling for making a threatening comment to a Team Manager, in violation of HMA's Workplace Violence Policy.  AF 23.

Boyd worked with Quality Team Managers Ty Harsh ("Harsh") and Craig Shirey ("Shirey") and Weld Line Quality Department Manager Jimmy Hilburn ("Hilburn").  AF 24.

### E.  Boyd's Application for the TC Position in 2003

On July 17, 2003, the Line 1 Weld Department posted a job opening for a Line Quality TC position.  AF 25.  Boyd and Jonathan Buse ("Buse") applied for the position and both were interviewed, despite Boyd receiving a 1.83 assessment score, because less than ten associates applied.  AF 26.

The interview team consisted of Harsh, Jackie Jones ("Jones"), and Mark Lail ("Lail"), all of whom had been trained in HMA's Selection Interview Workshop.  AF 27.  Boyd and Buse were asked the same questions measuring their work experience and people, leadership, and communication skills.  AF 28.  At the conclusion of Boyd's interview, the interview team compared notes and gave him an interview score of 34.  AF 29.  At the conclusion of Buse's interview, the interview team compared notes and gave him an interview score of 50, which was added to his Team Manager assessment score of 2.07.  AF 30.  Buse received a higher Team Manager

Assessment score due to his technical, business, and interpersonal skills, and a higher interview score because of his ability to communicate his job knowledge and his leadership and people skills.  AF 31.

HMA selected Buse for the TC position because he had the highest combined score.  AF 32.

### F.    Boyd's Interest in the ATS Position and Quality Auditor Function

On March 22, 2007, the Weld Department posted an Internal Mobility Job Posting for an ATS position.  AF 33.  Nineteen associates applied for the ATS position, and seven associates were eligible to proceed to the interview phase. AF 34. Plaintiff submitted no Job Interest Form.  AF 35.  Shane Cashman ("Cashman"), the associate selected for the position, received a 29.5 interview score, the highest of any candidate seeking the ATS position.  AF 36.

At all relevant times, Vickie White ("White") was assigned the Quality Auditor function as a part of her job duties as a Line Quality Process Associate.  AF 37. White was serving in this role prior to Shirey becoming Team Manager.  Shirey Aff. at ¶ 26.  Although the Quality Auditor function was not a promotion and would not have meant a pay raise for Boyd, Boyd believes that the experience would have helped him obtain a TC position.  AAF 2, Boyd Dep. at 94.  There was no application for the Quality Auditor function.  AAF 3.  Boyd had performed the same Quality

Auditor function at a previous place of employment.  Boyd Dep. At 94.

###### G.    Boyd's Interest in the New Model Program in 2008

In January 2008, HMA's Quality Group had two openings on the New Model project for the Honda Odyssey.  AF 39.  Because the assignment was for a major model project, the entire Quality Group was assessed; interested associates did self-assessments, and both the TC's and Team Manager completed assessments of those associates.  AF 40.

Boyd issued himself a 60 self-assessment score, received scores of 65 and 63 on his TC assessments, and a score of 60 on his Team Manager assessment, for a combined score of 248.  AF 41.  Michael Pair ("Pair") issued himself a 70 self-assessment score, received scores of 71 and 68 on his TC assessments, and a score of 66 on his Team Manager assessment, resulting in a combined total score of 275, the highest of any associate assessed for the New Model project.  AF 42.  Greg Lipham ("Lipham") issued himself a 71 self-assessment score, received scores of 67 and 68 on his TC assessments, and a score of 67 on his Team Manager assessment, resulting in a combined total score of 272, the second highest of any associate assessed for the New Model project.  AF 43.

Pair and Lipham received the New Model assignments because they received the two highest assessment scores; plaintiff was also considered ineligible because

he had received a corrective action within the past twelve months.  AF 44.  When Boyd questioned Shirey about why he did not get the assignment, Shirey told Boyd, "you'll be in line . . . [w]e'll bring you in later."  Boyd Dep. at 160.

### H.    Boyd's Complaints Regarding Promotions, Overtime, and Training

In June 2004, Boyd reported to Harsh that he felt that the selection process for TC jobs was unfair and that he was the "black sheep of the Quality Group" because he was not as informed as others.  AF 45.  Harsh explained the selection process to Boyd, encouraged Boyd to ask questions of management until he was satisfied with the information he received, and reminded Boyd that he could go to any member of management or AR with any concerns.  AF 46.  At no time did Boyd mention race or sex discrimination when he complained to Harsh.  AF 47.

In October 2006, Boyd reported to Deverick Williams ("Williams"), an African-American AR representative, that he felt that he was "treated as a black sheep of the department" and that he had concerns that training, overtime, and job assignments were being given to a specific "clique" of associates.  AF 48.  This "clique" was made up of a group of white male employees, Shirey, Pair, Buse, Lipham, Harsh, Cashman, and Jason McKinny, who hunted, fished, and socialized outside of work together.  AAF 1.  Williams reviewed Boyd's concerns with Hilburn, and he explained the business reasons for the decisions that Boyd questioned.  AF 49.

11

Williams then arranged a meeting between Boyd and Hilburn in which Boyd's concerns were directly addressed.  AF 49.

Boyd complained to Shirey and Hilburn about "the buddy system" and the fact that he was not being assigned to the New Model project in 2008, but never mentioned race or sex discrimination during this complaint.  AF 50.

## I.      Boyd's Allegations of Race, Sex, and Age Discrimination

Boyd filed his Charge of Discrimination with the Equal Employment Opportunity Council ("EEOC") on May 19, 2007, alleging race, sex, and age discrimination and retaliation.  AF 51.  Boyd's Complaint alleges that HMA subjected him to unfair terms and conditions of employment based upon his race, sex, and age, but he concedes that HMA never discriminated against him based upon his age and that he is not asserting an age discrimination claim in this suit.  AF 51.

Boyd alleges that HMA unlawfully denied him the 2003 TC position based on race.  AF 53.  Boyd alleges that he was more qualified for the position than Buse because he had experience working in Quality, but admits that he does not know the required qualifications, and concedes that he does not know Buse's qualifications. AF 54.  Boyd is aware that African-Americans fill other TC jobs at HMA, including TC jobs in HMA's Weld Quality Department.  AF 55.

Boyd also alleges that HMA unlawfully denied him the 2007 ATS position

12

based on his race.  AF 56.  Boyd contends that he was more qualified for the position

than Cashman because he had more seniority and because he had auditing and gauge

calibration experience, but admits that he does not know what qualifications HMA

required for the ATS position, and concedes that he does not know anything about

Cashman's qualifications.  AF 57.  Boyd admits that, other than the fact that he is

black and Cashman is white, he has no reason to believe that his race was the reason

he did not get the position.  AF 58.

Boyd alleges that HMA unlawfully denied him the Quality Auditor function

based on his race and sex.  AF 59.  Boyd contends that he was more qualified for the

assignment than White because he had experience auditing at his previous job, but

admits that he does not know what qualifications HMA required for the assignment.

AF 60.  Boyd contends that Shirey made the decision to assign White the Quality

Auditor function based on her race and sex but admits that this is only an assumption,

and concedes that he never expressed any interest in the Quality Auditor function

before White's assignment.  AF 61.  Other than the fact that White is a white female

and he has heard people say that she is "attractive," Boyd has no reason to believe

race or sex had anything to do with the Quality Auditor assignment.  AF 62.

Boyd also alleges that HMA unlawfully denied him the 2008 New Model

assignment based on his race.  AF 63.  Boyd contends that he was more qualified for

the assignment than Pair and Lipham because he had more experience working in Quality at HMA, but admits that anyone from the Quality Group was eligible for the assignment.  AF 64.

Boyd's race or sex played no role in HMA's decision to not place him in the TC position, ATS position, Quality Auditor function, or New Model project.  AF 65.

Boyd also alleges that he failed to apply for other TC and ATS jobs because he felt that he would not get them because of his race, but admits that African-Americans were awarded some of those positions and concedes that no one at HMA ever told him that he was not allowed to apply or that he would not receive fair consideration. AF 66.

Boyd contends that Shirey unlawfully denied him overtime in favor of certain white associates, the "clique."  AF 67.  During the time that Shirey was Boyd's Team Manager, overtime opportunities were offered to the associates assigned to the zone in which overtime was required; associates rotated zones every three months.  AF 68.

Boyd also contends that he was unlawfully denied training; specifically, he alleges that white associates were provided with the training he was denied.  AF 71. Boyd alleges that the requested training was needed for promotion as applicants were awarded fifty points for having robot training, Boyd Dep. at 187-88, but admits that other associates were promoted without such training, and concedes that the

requested training was not needed to perform his Line Quality job, AF 72.  Shirey typically did not authorize formal training for Process Associates that was not within the scope of their work or not within the departmental budget, but he did provide two weeks of informal offline training to every associate in the Quality group, including Boyd.  AF 73.  Boyd is aware that other African-Americans have received the requested training at HMA.  AF 74.

Boyd admits that no one at HMA ever said anything to make him believe that he was the subject of discrimination.  AF 75.

### J.     Boyd's Allegations of Retaliation

Boyd alleges that Shirey retaliated against him by not "speaking to me and messing with me like he used to" and by denying him overtime opportunities, but admits that he believes Shirey had denied him overtime before he raised any concerns to HMA management or AR.  AF 76.  Boyd states that in one instance following his 2006 discussion with Hilburn, Shirey did not include Boyd in an overtime opportunity that he made available to others.  Boyd Dep. at 119-20.  On another occasion there was a problem with a supply part on the doors that was causing a quality issue.  Boyd Dep. at 124.  Shirey took Cashman with him to North Carolina to meet with the supplier rather than Boyd, although the issue involved a D Zone Quality and Boyd was assigned to D Zone at that time.  Boyd Dep. at 124.

Boyd contends that he was retaliated against for complaining about promotional, overtime, and training opportunities and for his participation in union activity.   AF 77.   Boyd concedes that there is no way to separate the alleged discriminatory and retaliatory actions taken against him that are related to his union activity versus his race or raising concerns.   AF 78.

## IV.   ANALYSIS

### A.   RACE AND SEX DISCRIMINATION

Boyd alleges that he was not promoted due to his race and sex in violation of Title VII and 42 U.S.C. § 1981.[4]

### 1.   2003 TC

HMA asserts that Boyd's 2003 promotion claim is untimely as Boyd did not file his EEOC charge until May 19, 2007.[5]   (Doc. 33 at 19.)

To file a claim for discrimination under Title VII, the plaintiff must first exhaust his administrative remedies, beginning with the filing of a charge of discrimination with the EEOC.  *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317

---

[4]  Both of these statutes have the same requirements of proof and use the same analytical framework.  The court, therefore, will explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

[5]  The Court notes that Boyd did not address this argument in his Response to the Motion for Summary Judgment.

(11th Cir. 2001).  In a non-deferral state, such as Alabama, a plaintiff must file an employment discrimination charge with the EEOC within 180 days after the date of the alleged discrimination 42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005) (explaining that Alabama is a non-deferral state), *aff'd*, 550 U.S. 618 (2007), *superseded on other grounds  by statute*, Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 3, 123 Stat. 5, 5-6.  Failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge.  *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000).  The burden of establishing that a charge of discrimination was timely filed rests with the plaintiff.  *See Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982).

Boyd's EEOC charge was filed on May 19, 2007; thus, in order to be considered timely, the adverse employment action forming the basis of that charge must have occurred on or after November 15, 2007.  42 U.S.C. § 2000e-5(e)(1); *Ledbetter*, 421 F.3d at 1178.  An employer's failure to promote is a discrete act or single occurrence, which does not extend the limitations period.  *See AMTRAK v. Morgan*, 536 U.S. 101, 114 (2002).  As HMA promoted Buse to the TC position in July 2003,  Boyd's EEOC charge was untimely in regards to the 2003 TC position.

Unlike Title VII, a plaintiff is not required to exhaust his administrative

17

remedies before filing an action under 42 U.S.C. § 1981. *Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989), *superseded by statute as stated in Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004). Nevertheless, the suit still must be timely filed. Prior to 1990, courts were to apply the most analogous state statute of limitations to § 1981 claims, which was two years under Alabama law. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661-62 (1987), *superseded by statute as stated in Jones*, 541 U.S. at 383; *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1219 (11th Cir. 2001). In 1990, Congress enacted 28 U.S.C. § 1658(a), which created a default four-year limitations period for federal causes of action created after that date. 28 U.S.C. § 1658. One year later, as part of the Civil Rights Act of 1991, Congress amended § 1981 to include a cause of action for discrimination in the terms and conditions of employment. 42 U.S.C. § 1981.

In *Jones v. R. R. Donnelley & Sons Co.*, the Supreme Court determined that Congress's 1990 enactment of § 1658 changed the limitations period to four years for some claims under § 1981. *Jones*, 541 U.S. at 377-80. The Court explained that, to the extent that the Civil Rights Act of 1991 created new causes of action not previously cognizable under § 1981, such claims are subject to the four-year "catch-all" statute of limitations of § 1658. *Id.* at 380-83.

Prior to the Civil Rights Act of 1991, a failure-to-promote claim was actionable

under § 1981 "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." *Patterson*, 491 U.S. at 185-86.  Unlike a Process Associate, a TC is a non-exempt position with some managerial functions.  This court finds that the promotion from Process Associate to TC rises to the level of an opportunity for a new and distinct relation between the employee and HMA and thus would have been actionable under § 1981 prior to the Civil Rights Act of 1991.  *See id.*  Any action brought pursuant to this promotion under § 1981 must have been filed by July 2005 to be timely.  *See Goodman*, 267 F.3d at 1219.  Therefore, the court concludes that Boyd's claim that HMA failed to promote him to the 2003 TC position due to racial discrimination is time barred under both Title VII and § 1981.[6]

## 2.     2007 ATS and Other Positions for which Boyd did not Apply

In a traditional failure-to-hire case, the plaintiff establishes a *prima facie* case by demonstrating that: "(1) she was a member of a protected class; (2) she applied for and was qualified for a position for which the employer was accepting applications;

---

[6] The Court notes that, even were the promotion from Process Associate to TC not to rise to the level of an opportunity for a new and distinct relation between the employee and HMA, Boyd's action in regards to the 2003 TC position would still be time-barred as the promotion occurred in July 2003, more than four years prior to the filing of Boyd's complaint.  *See* 28 U.S.C. § 1658(a).

(3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class." *EEOC. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).  A non-applicant may nonetheless establish a *prima facie* case by showing that he refrained from applying to the position "due to a justifiable belief that the employer's discriminatory practices made application a futile gesture." *Id.* at 1274.  To demonstrate a "justifiable belief," the plaintiff must show:  "(1) that she had a real and present interest in the job for which the employer was seeking applications; and (2) that she would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." *Id.*

As Boyd did not submit a Job Interest Form for the 2007 ATS position, the court must examine his claim to determine whether he refrained from applying to the ATS position due to a justifiable belief that HMA's practices would have made his application futile.  Boyd states that he did not apply for some ATS and TC jobs because he felt that he would not get them due to his race.  Boyd Dep. at 208-10.  Boyd testified that he felt this way because he had not been successful in past applications.  Boyd Dep. at 210.  Boyd concedes that no one at HMA ever told him that he would not be allowed to apply or would not receive fair consideration for these positions.  AF 66.  Boyd was aware that African-Americans filled other non-

20

exempt jobs at HMA and an African-American was hired for one of the ATS positions that he did not apply for because he felt it was futile due to his race.  AF 55; Boyd Dep. at 212-13.  The court finds that Boyd has failed to show that he was deterred from applying for any positions by any discriminatory practices on the part of HMA.  *See Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 406 (5th Cir. 1999) (futility not found where evidence of discrimination is speculative); *Bryant v. Jones*, 696 F. Supp. 2d 1313, 1328 (N.D. Ga. 2010) (granting summary judgment because plaintiff "did *not* testify that he was aware of a gross and pervasive scheme of discrimination which deterred him from applying to the [] position and lead him to believe that his application would be futile").

Therefore, the court concludes that HMA is entitled to summary judgment on Boyd's claims under both Title VII and § 1981 concerning HMA's failure to promote him to the 2007 ATS and other positions for which he did not apply because Boyd has failed to make a *prima facie* case of discrimination with regards to these actions.

### 3.    Quality Auditor Function

HMA asserts that its assignment of the Quality Auditor function to White was a lateral job assignment and not a promotion; therefore, Boyd cannot prove that HMA's failure to assign him the Quality Auditor function resulted in an adverse employment decision.  (Doc. 33 at 24).

21

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  "Whether an action is sufficient to constitute an adverse employment action . . . must be determined on a case-by-case basis."  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).  A denial of a lateral transfer may be categorized as an adverse employment action where being denied the transfer results "in a serious and material change in the terms, conditions, and privileges of employment."  *Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1033 (11th Cir. 2008).

The Quality Auditor function was not a promotion and did not involve a pay raise.  In no relevant fiscal year did White accrue more overtime than Boyd.  Shirey Aff. Ex. H.  Although Boyd believes that the Quality Auditor function experience would have helped him obtain a TC position, AAF 2, Boyd Dep. at 94, he provides no support for this contention, *see* AF 54.  The court finds that the failure to transfer Boyd to the Quality Auditor function was not an adverse employment action.  *See Webb-Edwards*, 525 F.3d at 1033 (holding plaintiff failed to show that denial of lateral transfer resulted in a serious and material change in terms, conditions, and privileges of employment, because plaintiff's wages, benefits, and rank were not

affected).

Therefore, the court concludes that HMA is entitled to summary judgment on Boyd's claims under both Title VII and § 1981 concerning HMA's failure to transfer Boyd to the Quality Auditor function because Boyd has failed to make a *prima facie* case of discrimination with regard to this action.

### 4.    2008 New Model Program

HMA argues that, like the Quality Auditor function, the 2008 New Model program was a lateral assignment, not a promotion; therefore, Boyd was not subjected to an adverse employment action when he was not selected for the function.  (Doc. 33 at 25).  HMA asserts that, even if Boyd were subject to an adverse employment action, he cannot establish a *prima facie* case as he was not qualified for the position. (Doc. 33 at 26).

Unlike the Quality Auditor function, the transfer to the 2008 New Model program involved an increase in the availability of overtime hours.  Shirey Dep. at 62-64.  In the fiscal year in which they were assigned to the 2008 New Model program, Lipham and Pair earned 200.5 and 130.65 more overtime hours respectively than Boyd.  Shirey Dep. at 6.  The court finds that the denial of Boyd's application for a lateral transfer to the 2008 New Model program, resulting in a decreased opportunity for overtime, was an adverse employment action.  *See Bass v. Bd. of Cnty. Comm'rs*,

256 F.3d 1095, 1118 (11th Cir. 2001) (finding that denial of the opportunity to earn overtime pay constituted an adverse employment action).

To establish a *prima facie* case in a failure-to-hire case, the plaintiff must demonstrate that he was qualified for the position for which the employer was accepting applications. *Joe's Stone Crabs*, 296 F.3d at 1273. Pursuant to HMA's Promotion Process, an applicant with an active corrective action was ineligible for assignment to the 2008 New Model program. AF 13, 19. Boyd had received a corrective action within the twelve months prior to the lateral opening. AF 44. As Boyd was not qualified for the position, the court finds that he has failed to make out a *prima facie* case of discrimination.

Even were Boyd able to make out a *prima facie* case of discrimination, the court finds that Boyd has not shown that HMA's reasons for not transferring Boyd to the 2008 New Model program were merely a pretext for discrimination. Pair and Lipham had the highest scores of any associates assessed for the 2008 New Model program. AF 44. There is no evidence that they had active corrective actions. Boyd has offered no similarly situated white associate who has been assigned to a New Model program without having the highest combined assessment score or after receiving corrective action within the preceding twelve months. Shirey's statement to Boyd, "you'll be in line . . . [w]e'll bring you in later," does not demonstrate that

24

HMA's proffered reason for not transferring Boyd to the New Model program is false.

### 5.     Overtime

Boyd asserts that white employees are allowed to get overtime far in excess of others in the department.  (Doc. 1 at ¶ 17).  Out of the twelve Process Associates who worked in the Weld Quality Department, Boyd received more overtime than eight others, including six whites, during the 81K period.  Shirey Aff. Ex. H.  In the 82K period, Boyd had more overtime than six others, including four whites.  *Id.*  In the 83K period, Boyd had more overtime than four others, including three whites.  *Id.* In the 84K period, Boyd had more overtime than four others, including three whites. *Id.*  During this period, Tommy Bivins ("Bivins"), an African-American Process Associate, had more overtime than eleven others, including eight whites.  Shirey Dep. at 61, Shirey Aff. Ex. H.  In the 85K period, there were eleven Process Associates. Boyd had more overtime than four others, including three whites.  Shirey Aff. Ex. H. During this period, Bivins had more overtime than eight others, including six whites. *Id.*

The record reflects that Boyd worked a comparable amount of overtime as other Process Associates.  Thus, the court finds that Boyd has failed to demonstrate an adverse employment action relative to overtime hours.  *See Osahar v. Postmaster*

*Gen of U.S. Postal Serv.*, 263 Fed. Appx. 753, 762 (11th Cir. Jan. 15, 2008).  Even

assuming that the extent to which Boyd alleges to have been bypassed for overtime

assignments did rise to the level of adverse employment action, Boyd has failed to

point to evidence that he was both qualified and available to work overtime under

HMA's system for assigning it, but was passed over in favor of a white employee.

*See id.*

Therefore, the court concludes that HMA is entitled to summary judgement on

Boyd's claims of racial discrimination under both Title VII and § 1981 concerning

HMA's assignment of overtime to Boyd, because Boyd has failed to make a *prima*

*facie* case of discrimination.

### 6.    Training

In order to rise to the level of an adverse employment action, a denial of

requested training must affect the terms and conditions of employment.  Merriweather

v. Ala. Dep't of Pub. Safety, 17 F. Supp. 2d 1260, 1271 (M.D. Ala. 1998).  The

plaintiff must show that the inability to train would affect his salary, chances of

promotion, or ability to perform his job.  *Id.*  Here, Boyd claims that he was denied

training in order to keep him from being promoted or qualified to move to different

higher paying positions.  (Doc. 1 at ¶ 16).  Boyd requested and was denied robot

training, although applicants were awarded fifty points for having robot training.

26

Boyd Dep. at 187-88.  The denial of such training may constitute an adverse employment action.

HMA has provided legitimate business reasons for their denial of training. Shirey did not typically authorize for Process Associates formal training that was not within the scope of their work or within the departmental budget.  AF 73.  *See Brown v. Progress Energy*, 364 Fed. Appx. 556, 558 (11th Cir. Feb. 4, 2010) (finding no action for failure to train claim because senior lineman about whom plaintiff complained was notoriously reluctant to provide training to any of the apprentices in his crew, regardless of their race).  Boyd did not need robot training to perform his Line Quality job.  AF 72.  Additionally, the court notes that other African-Americans have received the requested training at HMA.  AF 74.

Thus, the court concludes that HMA is entitled to summary judgement on Boyd's claims of racial discrimination under both Title VII and § 1981 concerning HMA's failure to train, because Boyd has failed to demonstrate that HMA's proffered business reasons for the denial of training are a pretext for discrimination.

## B.   RETALIATION

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) a materially adverse action; and (3) a causal relation between the two events.  *Butler v. Ala. DOT*, 536 F.3d 1209, 1212-13 (11th

27

Cir. 2008).

Title VII recognizes two different types of protected activity, known as the "Opposition Clause" and the "Participation Clause."  Under the Opposition Clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  Under the Participation Clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.*  Boyd does not allege that he was retaliated against for filing his May 2007 EEOC Charge; therefore, the Participation Clause does not apply.

Boyd made complaints to management in June 2004 concerning the selection process for TC jobs and in October 2006 concerning the unequal provision of training, overtime, and job assignments.  AF 45, 50.  At no time did Boyd mention discrimination based on his race or sex.  AF 47, 50.  A grievance alleging unfair treatment, absent discrimination based on race, sex, or national origin, does not constitute statutorily protected activity.  *Coutu v. Martin Cnt. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).

Therefore, the court finds that HMA is entitled to summary judgment on Boyd's claim of retaliation, because he has failed to establish a *prima facie* case of

28

retaliation.

## V.    CONCLUSION

Accordingly, for the reasons stated above, HMA's Motion for Summary Judgment is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this the 16th day of December, 2010.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

29